UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KATHLEEN AMIOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02922-JRS-DLP |
| | ) | |
| NSK AMERICAS INC., | ) | |
| | ) | |
| Defendant. | ) | |

## Order on Motion for Summary Judgment

Plaintiff Kathleen Amiott contends her former employer, NSK Americas Inc., terminated her because of her age and sex and because she complained about discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.  Currently before the Court is NSK's Motion for Summary Judgment.  (ECF No. 38.)  For the following reasons, the Court **grants** the Motion.[1]

## I. Background

NSK hired Amiott in 2011, when Amiott was fifty-three, as a metallurgical engineer in the quality department of its Liberty, Indiana plant.  (Amiott Dep. 47, 351, ECF No. 39-1.)  At all relevant times, Amiott reported to Ella Casper.  (Casper Dep. 31, ECF No. 39-2.)  Casper ultimately terminated Amiott on October 30, 2019.  (ECF No. 39-9.)  At the time of termination, Amiott was sixty-one, and Casper was

---

[1] NSK also filed a Motion for Leave to File a Sur-reply Brief.  (ECF No. 68.)  That Motion is **denied** for the reasons set out in Amiott's Response in Opposition.  (ECF No. 70.)

forty-four.  (Def.'s Supp. Answer Interrog. 1, ECF No. 46-8; Amiott Dep. 47, ECF No. 39-1.)

Prior to her termination, Amiott experienced a "toxic" work environment that was "unfriendly to females," although she does not bring a harassment claim.  (Amiott Dep. 94, ECF No. 39-1.)  Amiott was the only female engineer at the Liberty plant, and she testified that men spoke to her differently and disrespectfully, that she and other women were the victim of frequent pranks that were directed only at women, that she received phone calls from nursing homes after a coworker provided those facilities with her contact information, and that she was paid less than her male counterparts.  (Amiott Dep. 77–79, 88–89, 181–83, ECF No. 39-1.)  Amiott described other behavior as well, but since she is not pursuing a harassment claim, much of it is not relevant.  She mentions a few particular comments that are of note, however. One coworker made remarks about Amiott's age, sex, and weight, including calling her a "fat bitch" and calling her a "bitch" multiple times, (Amiott Dep. 143–50, ECF No. 39-1), and another told Amiott to "get [her] old, fat ass off [his] desk," and made comments similar to that one "all the time," (Amiott Dep. 120, ECF No. 39-1).  Amiott also notes that Casper, her supervisor, made several "age-based comments."  (Pl.'s Resp. 11, ECF No. 47.)  Casper made remarks "about how [Amiott] shouldn't be doing something, largely because of [her] age," such as working in the lab or driving after dark.  (Amiott Dep. 413, ECF No. 39-1.)  When Amiott and Casper once discussed how Amiott had arthritis in her knees, Casper "referenced her mother and her mother's age and how [Amiott's arthritis] was similar to the problems her mother

2

had, who was an older woman." (Amiott Dep. 413–14, ECF No. 39-1.) And when "casual conversation" about Amiott not retiring at age sixty-five once arose, Casper said something along the lines of asking Amiott if she was "sure that that's the way [she wanted] to play it," or that she "probably [didn't] want to do that." (Amiott Dep. 414, ECF No. 39-1.)

Amiott devotes a fair portion of her brief to describing her coworkers' shortcomings, particularly those of Jason Isaacs, including his affairs with coworkers, tendency to yell, and arguments between him and Amiott and him and other coworkers. (Pl.'s Resp. 13–18, ECF No. 47.) She concludes that "[d]efendant's failure to appropriately address problematic and potentially harassing and inappropriate behavior and employee complaints is evidence of an environment of discriminatory treatment towards Plaintiff that was excused or mischaracterized." (Pl.'s Resp. 15, ECF No. 47.)

Amiott and Isaacs had another conflict around August 10, 2019. (Amiott Dep. 445–47, ECF No. 39-1.) After Isaacs got upset that Amiott put parts on hold that failed quality testing, Isaacs "went off on" Amiott and yelled at her in an "aggressive" way. (Amiott Dep. 450–52, ECF No. 39-1.) Amiott had complained about Isaacs to Casper in the past, did so again about this incident, and informed Casper that she "was going to have to escalate" the situation to human resources if Casper could not handle it. (Amiott Dep. 317, 448–55, 460, ECF No. 39-1.) Casper responded with something along the lines of, "it's just Jason being Jason," and that Amiott was going to have to deal with it. (Amiott Dep. 449, 455, ECF No. 39-1.) When Amiott stated

that she needed to feel safe from this type of bullying and verbal abuse, Casper responded that she could not guarantee that.  (Amiott Dep. 316, 320, 456, ECF No. 39-1.)

Shortly after meeting with Casper, Amiott met with human resources manager Kris Wolski.  (Amiott Dep. 457–58, ECF No. 39-1.)  Amiott expressed that she wanted to keep the meeting a secret because she was worried about being retaliated against for complaining to human resources.  (Amiott Dep. 70, ECF No. 39-1.)  Amiott told Wolski about the most recent conflict with Isaacs; about all the "practical jokes" and pranks she had experienced, such as when someone poked a hole in her soda bottle or when someone left an oily footprint on her new desk chair; and "everything that involved any sort of harassment that had happened" during her employment.  (Amiott Dep. 64–65, 71–73, ECF No. 39-1.)  After this meeting, "the whole tone" of Amiott and Casper's relationship changed, and Casper assigned Amiott an "unreasonable task" and began scrutinizing Amiott's work.  (Amiott Dep. 477–81, ECF No. 39-1.)

Amiott was terminated on October 30, 2019.  (ECF No. 39-9.)  NSK explains the termination as one of multiple cost-saving measures it implemented to eliminate the significant deficit it was projected to have that year; Amiott argues this explanation is a pretext for discrimination.

## II.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine only "if the

evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). The Court need only consider materials cited by the Parties but may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III.   Discussion

Title VII and the ADEA prohibit an employer from terminating an employee because of the employee's sex or age, respectively. 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a)(1). Both statutes also protect those who report or oppose their employer's discriminatory behavior from retaliation from doing so. 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d). Amiott brings claims for discrimination and retaliation under both statutes.

### A. Sex and Age Discrimination

"[T]he singular question that matters in a discrimination case [is]: '[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor [such as age] caused the discharge or other adverse employment action.'" *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887,

894 (7th Cir. 2018)).  A plaintiff can use the *McDonnell Douglas* framework to present such evidence but need not do so; "[h]owever the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* her [protected characteristic]."  *Id.* (quoting *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 720 (7th Cir. 2018)).  This is the standard the Court uses to assess Amiott's claims; the Court does not ask whether Amiott has presented a "convincing mosaic" of evidence, (Pl.'s Resp. 23, ECF No. 47).  *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016) (reiterating that "convincing mosaic" is "not a legal test" and emphasizing that the proper inquiry is whether the evidence, considered as a whole, would permit a reasonable factfinder to conclude that the plaintiff's protected characteristic caused the discharge).

While Amiott brings both sex and age discrimination claims, her evidence in support of the two largely overlap, so the Court addresses them together unless otherwise necessary.  The most probative and disputed piece of evidence relates to NSK's explanation for Amiott's termination and how NSK reallocated Amiott's duties, so the Court starts there.

    1.  <u>Pretext and Reallocation of Amiott's Duties</u>

Amiott contends that NSK's explanation was pretextual and that her manager, Ella Casper, "admitted in an October 28, 2019 email that by hiring a male engineer at the Franklin plant, [she] could retain a younger, male engineer at the Liberty plant and terminate Amiott by reassigning her duties to 40 year old Doug Schwab and

another male engineer at Franklin." (Pl.'s Resp. 24, ECF No. 47.) Ultimately, though, Amiott cannot show NSK's explanation was pretextual; her description mischaracterizes the evidence and is belied by the record.

Casper testified—and others confirmed—that NSK was creating a financial plan for the year when the plan revealed that a "disastrous" year was ahead. (Casper Dep. 97–99, ECF No. 39-2.) Two of NSK's product lines "were reducing," so NSK "started seeing issues with the amount of labor spending based off of the new demand levels." (Grissom Dep. 22, ECF No. 39-5; *see also* Casper Dep. 106, ECF No. 39-2 ("We lost volume in the integral shaft bearing department and volume in the magnetic clutch bearing departments. We just lost sales. I think we lost a customer in that year.").) In other words, business was down and labor costs were too high, so NSK had to find a way to cut back on costs. Indeed, the business plan revealed that NSK's 2019 labor costs for the Liberty plant were projected to be $652,000 higher than the previous year, with $293,000 of that coming from salary costs. (Business Plan 2–3, ECF No. 51-3.) To address some of the deficit, two open engineering positions were not filled, (Grissom Dep. 50–51, ECF No. 39-5; Business Plan 2, ECF No. 51-3), but NSK was "looking for [additional] savings opportunities," (Business Plan 2, ECF No. 51-3), so managers, including Casper, were asked to identify any positions that could be eliminated, (Casper Dep. 99, ECF No. 39-2; Grissom Dep. 50–51, ECF No. 39-5 (testifying that "the loss of business in [magnetic clutch bearing] and [integral shaft bearing]" resulted in "negative numbers on labor" so the team was asked "to make

7

changes to our [business] plan and to reduce it down from a standpoint of labor and head count")).[2]

Casper looked at her employees' skill sets and length of service, as well as how cross trained they were to do other people's job responsibilities. (Casper Dep. 99, ECF No. 39-2.) She determined that Amiott's metallurgical engineer position was a "duplicated position"—other people could take on those responsibilities. (Casper Dep. 100, ECF No. 39-2.) There was a group of metallurgical engineers at the corporate office who had the "same skill set and background as [Amiott] did" who could fill that role, (Casper Dep. 100, ECF No. 39-2), and Doug Schwab could also serve as "a resource" before sending things to corporate because he "had been part of that metallurgical heat treat engineering group" and "had a good skill set" that could handle Amiott's responsibilities, (Casper Dep. 102–03, ECF No. 39-2). Schwab could also assume Amiott's program management duties. (Casper Dep. 102, 55, ECF No. 39-2.) In contrast, other positions required capabilities that people at corporate lacked the knowledge and skill set to do, so those positions could not be eliminated. (Casper Dep. 100, ECF No. 39-2.) In fact, when Amiott was hired in 2011, NSK did not have a metallurgical engineer; NSK had terminated the previous one when the recession hit, and Schwab, another employee, and corporate were being used to fill some of the void. (Amiott Dep. 351–52, ECF No. 39-1.) And Amiott's position did not exist at the Liberty plant's sister plant in Franklin. (Casper Dep. 100, ECF No. 39-

---

[2] Amiott argues that the two engineering positions that went unfilled were not positions in the quality department, in which Amiott worked. (Pl.'s Resp. to Def.'s Suppl. Br. 3, ECF No. 66.) But this distinction is immaterial—the labor costs looked at the Liberty plant as a whole, not just Amiott's department.

2.)  This simply confirms the realization Casper came to: Amiott's position was dispensable.   So, Casper proposed terminating Amiott and doing some other restructuring, and her proposition was ultimately implemented.

Revised business plans projecting costs with three open positions—which the Court understands to mean the two unfilled engineering positions and Amiott's unfilled position—showed a savings of $169,000 in salary costs.  (Business Plan 5, ECF No. 51-3.)  "Along with some other changes" NSK had to do regarding "spending equipment, installation," and depreciation reductions, NSK was able to revise its projections to go from the $652,000 deficit to a surplus of $61,000.  (Grissom Dep. 50–51, ECF No. 39-5; *compare* Business Plan 3, ECF No. 51-3 (projecting $652,000 deficit if current headcount was maintained and two open positions were filled), *with* Business Plan 5, ECF No. 51-3 (projecting $61,000 surplus with three open positions).)

Amiott attempts to cast doubt on NSK's cost-savings justification by highlighting the details of the rest of the restructuring and by pointing to the age and sex of the employees who assumed her responsibilities.  She claims her termination paved the way for Casper to create new jobs for, and give promotions to, younger and male employees.  But this, too, misconstrues the evidence.

Amiott first points to Casper's "hir[ing]" of Doug Wildey.  But Wildey was not a "new hire"—he had worked for NSK for over twenty years, was simply switching departments, and Casper had organized the switch "quite a bit prior to" Amiott's termination.  (Casper Dep. 103, ECF No. 39-2 ("I waited almost a year until I got

9

him.").)  Moreover, Wildey worked at the Franklin plant—not the Liberty plant where Amiott worked—so his salary costs do not affect the calculations discussed above.[3] (*Id.* at 103–05.)  Amiott also notes that NSK chose to retain Doug Schwab, a then-40-year-old engineer who "made substantially more than Amiott and had documented performance problems that led him to accept a demotion."  (Pl.'s Resp. 19, ECF No. 47; Def.'s Suppl. Answer to Interrogs., ECF No. 46-8.)  But Schwab made $10,000 more than Amiott because he had been with NSK for ten years longer than her, (Def.'s Suppl. Resp. to Disc. Requested 2, ECF No. 46-10); his tenure with NSK made him a versatile employee and he could absorb some of Amiott's duties because he had previously done them, (Casper Dep. 102–03, ECF No. 39-2); and "documented performance problems" is an overstatement—he received one "meets some expectations" rating on one performance review and was not demoted but asked to move to a new position due to his desire for expanded career growth, (ECF No. 46-9 at 14–15).  And even though he made more money than Amiott, Casper testified that she considered employees' length of service and how cross-trained they were.  Both of these factors weigh in Schwab's favor.  Moreover, these are the types of decisions as to which an employer is entitled to exercise its judgment.  *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1761 (2020) (Alito, J., dissenting) ("Title VII prohibits discrimination based on five specified grounds . . . .  As long as an employer does not discriminate based on one of the listed grounds, the employer is free" to make

---

[3] While Amiott emphasizes the ages of the other retained employees, she is silent as to Wildey's age.  Wildey's age does not appear to be in the record.  But considering Amiott's silence and that Wildey had worked for NSK for over twenty years, it appears that he may have been similar in age to Amiott.

employment decisions); *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 895 (7th Cir. 2016) (noting that, in the Title VII context, courts do not "second-guess[ ] employers' business judgments"*); Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) ("federal courts are not a super-personnel department").

Amiott goes on, claiming Casper "created a new" position for 53-year-old female Sandy Langdon, which allowed Casper to promote 40-year-old female Rachel Hann, and then to move a 22-year-old male intern, Jakob Miers, into Hann's old position, and later to hire Miers as an engineer. (Pl.'s Resp. 20–21, ECF No. 47.) But there is no inference of discrimination to be drawn here. These moves were consistent with Casper's explanation of the restructuring and do not cast doubt on NSK's explanation that Amiott's position was duplicative and could be eliminated to reduce costs. (*See* Casper Dep. 43, 110, ECF No. 39-2 (noting that Langdon's "new" position was created by eliminating a different position and that it was equivalent in salary as her prior position; "[w]e did a lot of shuffling"); ECF No. 64-4 (showing Langdon's salary as the same in both roles); ECF No. 64-3 (showing Hann received a 21-cent raise when moving positions); Casper Dep. 86–87 (testifying that Miers was moved into Hann's old position because no one else applied for it); ECF No. 64-5 (showing Miers was hired as an engineer in a different fiscal year than when the restructuring happened and that the salary of that role was $55,000, which was over $15,000 less than Amiott's compensation at the time of her termination, (ECF No. 46-12)); ECF No. 64-1 (listing Miers's engineering job responsibilities, which did not overlap with Amiott's former responsibilities).) It is undisputed that Amiott's position was not filled.

(Amiott Dep. 511, 515, ECF No. 39-1 ("I understand that my position went unfilled but that people were doing many of the jobs that I was doing. . . Nobody was doing the actual metallurgy anymore."); Casper Dep. 109, ECF No. 39-2 ("I had 17 [employees] with Kathleen, and I have 16 now.  So I am down one head count.").) Moreover, some of Amiott's duties were absorbed by Sandy Langdon, a female who was only eight years younger than Amiott.  (Amiott Dep. 511–12, ECF No. 39-1 ("[A] good percentage of [Sandy's] job was working on the deposition of material which had been my job.").)  Simply put, there is not an inference of discrimination when it is undisputed that NSK faced significant cost problems and projected that eliminating Amiott's position and not filling two more would reduce the deficit; Amiott's position was the only one identified as duplicative, especially considering NSK had eliminated that role when hard times had hit in the past; and Amiott's duties were absorbed by two people who had done them before Amiott was hired by NSK, one of whom was a woman only eight years younger than her.

    2. <u>Other Evidence</u>

Amiott attempts to show pretext and discrimination in other ways.  First, she notes that the decision to terminate her was made "in a very short time inconsistent with NSK's typical process."  (Pl.'s Resp. 33, ECF No. 47.)  This argument is based on human resources employee Kris Wolski's testimony that he was "somewhat surprised" to find out that Amiott was terminated while he was out of the office on a two-week vacation, since "usually things like that don't happen just during the time" he would have been on vacation.  (Wolski Dep. 63–65, ECF No. 39-13.)  But he also

testified that there was "not really" anything unusual about the fact that he was unaware Amiott would be terminated until he returned from vacation, since "[t]he terminations that [he was] typically involved with are due to disciplinary issues or performance issues," whereas this was a restructure.  (Wolski Dep. 63–64, ECF No. 39-13.)  Further, the timeline was expedited due to business needs.  (ECF No. 39-20 at 5 (email from Kyle Stiens, not Casper, informing human resources that they wanted to finalize the termination promptly "because we have the PYT launch with full inventory starting next Friday and they will not have time for a couple weeks after").)  Little, if any, discriminatory motive can be inferred from this.

Second, Amiott notes that Casper made "multiple and repeated age-based comments."  (Pl.'s Resp. 24, ECF No. 47.)  Amiott's best evidence on this front is that Casper made remarks "about how [Amiott] shouldn't be doing something, largely because of [her] age," including "things in the lab," (although Amiott also noted it was "especially if [she] was staying after [her] normal work time to try to get them to catch up on something), and how Amiott "shouldn't drive after dark anymore."  (Amiott Dep. 413, ECF No. 39-1.)  Amiott also cites that when she and Casper discussed Amiott's arthritis, Casper "referenced her mother," "who was an older woman," and how Amiott's arthritis "was similar to the problems [Casper's] mother had."  (Amiott Dep. 414, ECF No. 39-1.)  And when employees were joking about Amiott retiring at 65 to avoid a big project and Amiott responded that she had no plans to retire at 65, Casper said something in the "casual conversation" along the lines of, "you probably don't want to do that" or "are you sure that that's the way you want to play it."

13

(Amiott Dep. 414, ECF No. 39-1.)  Finally, shortly before Amiott's termination, when the topic of her birthday came up, Casper asked how old Amiott was going to be. (Amiott Dep. 415, ECF No. 39-1.)  Amiott notes that Casper's tone "was odd" and that Casper "should have known how old [Amiott] was because we'd celebrated my 60th birthday the year before."  (Amiott Dep. 415, ECF No. 39-1.)  But all of these comments are "stray remarks," which typically do not create an inference of discrimination. *See Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009) ("An isolated comment or 'stray remark' is typically insufficient to create an inference of discrimination, but it may suffice if it (1) was made by the decision-maker, (2) around the time of the decision, and (3) referred to the challenged employment action."); *O'Connor v. DePaul Univ.*, 123 F.3d 665, 672 (7th Cir. 1997) (holding that stray remarks "may not overcome summary judgment if they stand alone as evidence that might support an inference of pretext" in an age discrimination case).  Even though these comments were made by Casper—a decisionmaker—the comments either were not made around the time of Amiott's termination, or were not made in reference to her termination, or both.  So, these comments do not raise an inference of age discrimination.

Finally, Amiott resorts to the general environment and mistreatment of women in the workplace, including the pranks she and other women were exposed to (putting ketchup on a door handle, poking holes in women's drinks, etc.); some of her coworkers' comments on her age or weight or that she was "a bitch"; and her ongoing conflict with Jason Isaacs.  None of this raises an inference of *discrimination* on

14

*Casper*'s part, however.  Aside from the comments made by Casper that the Court discussed previously, Casper did not make any of the comments referenced by Amiott, and Casper's toleration of workplace pranks and Isaacs's yelling—the latter will be addressed further in regards to Amiott's retaliation claim—does not support an inference that Casper harbored discriminatory animus when terminating Amiott. *See Mach*, 580 F.3d at 499 (stray remarks of non-decisionmakers are typically insufficient to raise an inference of discrimination).

Under the *McDonnell Douglas* framework, Amiott cannot show that NSK's reason for terminating her was pretextual.  *Brooks v. Avancez*, 39 F.4th 424, 434 (7th Cir. 2022) (if employer produces evidence demonstrating it took adverse action for legitimate, nondiscriminatory reasons, the plaintiff must demonstrate that the reason is pretextual).  And more generally, when "consider[ing] all admissible evidence,"—including Casper's comments, the environment of the plant more generally, and even assuming the quickened timeline for Amiott's firing was suspicious—no reasonable jury could find that Amiott was terminated because of her age or sex and not because NSK needed to cut labor costs and Amiott's position could be eliminated while others could not.  *Tyburski*, 964 F.3d at 590.  Summary judgment is proper.

## B. Retaliation

To establish a retaliation claim, a plaintiff must demonstrate "(1) that she engaged in statutorily protected activity; (2) that her employer took a materially adverse action against her; and (3) that the protected activity and the adverse action are

causally connected." *Eaton v. J. H. Findorff & Son., Inc.*, 1 F.4th 508, 511 (7th Cir. 2021) (citations omitted).   "As with discrimination claims, the question for a retaliation claim should always be: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?'" *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) and citing *Ortiz*, 834 F.3d at 765)).

Amiott proceeds with her retaliation claim under two different theories.  First, Amiott contends she engaged in protected activity when she complained to human resources manager Kris Wolski.  But that claim fails because Casper was ultimately responsible for Amiott's termination, and Casper lacked knowledge that Amiott had engaged in protected activity in the meeting with Wolski.  Second, Amiott contends she engaged in protected activity when she complained directly to Casper, irrespective of whether Casper knew about the meeting with Wolski.  But that claim fails because Amiott's complaint to Casper did not oppose conduct proscribed by Title VII or the ADEA and therefore did not constitute protected activity.

    1. <u>Meeting with Wolski</u>

To engage in protected activity, the plaintiff must have a subjective belief that she opposed a practice made unlawful by Title VII or the ADEA, and that belief must be "objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII [or the ADEA]." *Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021) (quoting *Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019)).

The Parties have conflicting accounts of the meeting between Amiott and Wolski, but Amiott testified that she informed Wolski of "everything that involved any sort of harassment that had happened." (Amiott Dep. 65, ECF No. 39-1.)  The Court will assume that includes incidents that objectively and subjectively could be considered prohibited by Title VII or the ADEA, such as complaints that men were undermining Amiott's authority in the lab because she was a woman, or that her male coworkers called her a bitch, or that her coworkers harassed her because of her age by giving her phone number to nursing homes and telling her to get her "old, fat ass" off the desk.

This claim runs into another problem, however.  "In order to demonstrate that a defendant was motivated to retaliate based on the plaintiff's protected activity, the plaintiff must first produce evidence that the defendant had actual knowledge of the protected activity." *Eaton v. J. H. Findorff & Son, Inc.*, 1 F.4th 508, 512–13 (7th Cir. 2021) (citing cases).  "It is not sufficient that a decision-maker could have or even should have known about the employee's complaint."  *Id.* at 513 (citing *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009)).

Amiott has not produced evidence that Casper had knowledge of the meeting between Amiott and Wolski.  On the contrary, Casper testified that she learned of the meeting "[a]fter [Amiott] filed the lawsuit." (Casper Dep. 119, ECF No. 39-2.)  Indeed, Amiott specifically asked Wolski to keep the meeting "secret," (Amiott Dep. 70, ECF No. 39-1), and Wolski testified that he did not believe he told anyone about the meeting until after Amiott had been terminated and he "found out there was more

17

going on," namely, that Amiott filed suit, at which time he informed management of the meeting and turned over his notes, (Wolski Dep. 65, ECF No. 39-13).  And it makes sense that Wolski would not have felt the need to tell anyone, as Amiott told Wolski she "did not want him to act on" anything she told him in the meeting and that she just "wanted to document everything."  (Amiott Dep. 70, ECF No. 39-1.)

In response, Amiott notes that it would have been unusual for her to be speaking with Wolski, and another employee, Anthony, saw them talking.  (Pl.'s Resp. 19, ECF No. 47; Amiott Dep. 476, ECF No. 39-1.)  Anthony was a good friend of Casper's, so Amiott maintains that the "odds are pretty good" that Anthony mentioned the meeting to Casper, especially considering Casper's attitude toward Amiott changed after the meeting.  (Amiott Dep. 476–78, ECF No. 39-1.)  Amiott argues that this raises a question of fact as to whether Casper knew Amiott complained to Wolski.

However, even if Casper knew Amiott complained to Wolski, Casper did not know that Amiott was complaining that she was being discriminated against because of her age or sex.  The alleged tattletale, Anthony, had no knowledge of the content of the meeting between Amiott and Wolski.  Even assuming he did tell Casper that he saw the two meeting, Casper would have had no reason to know that Amiott complained about anything other than Isaacs's conduct.  After all, Amiott specifically told Casper that she "couldn't keep dealing with [Isaacs] going off on [her] and that [she] was going to have to escalate if [Casper] couldn't stop it."  (Amiott Dep. 455, ECF No. 39-1; *see also* Amiott Dep. 71, ECF No. 39-1 (emphasis added) ("I was telling [Casper] I

18

was going to escalate *the situation with Jason Isaacs*.")) And Isaacs's conduct was not discriminatory.

*Eaton* is instructive. There, the plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging she was subjected to sex discrimination. *Eaton*, 1 F.4th at 510. The plaintiff's supervisor was informed that the plaintiff "had filed a grievance," but the supervisor was never told that the plaintiff's "complaint was based on sex discrimination." *Id.* The plaintiff was eventually terminated, and when she later indicated she would like to be rehired, the supervisor refused. *Id.* at 511. The plaintiff alleged this refusal to rehire was retaliation for her earlier EEOC charge. *Id.*

The Seventh Circuit rejected that contention. *Id.* at 512–13. It concluded that the supervisor "did not know that [the plaintiff's earlier] complaint was based on discrimination," so a trier of fact could not conclude that the EEOC charge was "the but-for cause" of the refusal to rehire. *Id.* at 512. The supervisor had only been informed that the plaintiff "had complained about the layoff," but "the nature or basis of the complaint" was not communicated to the supervisor. *Id.* Rather, the supervisor believed the plaintiff had filed a union grievance. *Id.*

The same is true here. Casper "did not know that [Amiott's] complaint [to Wolski] was based on discrimination," so a trier of fact could not conclude that Amiott's complaint was "the but-for cause" of her termination. Even if Anthony told Casper that he saw Wolski and Amiott meeting, Casper was only informed that Amiott "had complained," but she was not aware of "the nature or basis of the complaint." And

even if Casper put two and two together, based on the timing of the meeting—shortly after Amiott had complained to Casper about Isaacs—and Amiott's comments that she was "going to escalate the situation with Jason Isaacs," (Amiott Dep. 71, ECF No. 39-1), Casper only would have had knowledge that Amiott complained about Isaacs, not that Amiott complained about "everything that involved any sort of harassment that had happened," (Amiott Dep. 65, ECF No. 39-1).  And knowledge that Amiott complained about Isaacs is insufficient because that complaint did not indicate that "discrimination" occurred, or that it occurred "because of" Amiott's age or sex. *Emerson*, 900 F.3d at 472.

Title VII and the ADEA only prohibit retaliation for opposing a practice made unlawful by those statutes, namely, sex or age discrimination.  42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).  "Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate [that] the discrimination occurred because of sex, race, national origin, or some other protected class."  *Emerson v. Dart*, 900 F.3d 469, 472 (7th Cir. 2018) (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)).  "[I]f a plaintiff opposed conduct that was not proscribed by Title VII [or the ADEA], no matter how frequent or severe, then his sincere belief that he opposed an unlawful practice cannot be reasonable."  *Logan v. City of Chicago*, 4 F.4th 529, 539 (7th Cir. 2021) (quoting *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000), *overruled on other grounds by Hively v. Ivy Tech Cmty. Coll.*, 53 F.3d 339 (7th Cir. 2017)).

Isaacs's conduct of yelling at Amiott is not conduct "proscribed by" Title VII or the ADEA.  Amiott cites no evidence that Isaacs yelled at her *because of* her age or *because of* her sex; rather, the evidence shows that Isaacs yelled *because* he was stressed about work.  (*See, e.g.*, Hann Dep. 42–43, ECF No. 39-3 (describing Isaacs raising his voice at Amiott as "inappropriate" but saying it was all "work related" because Isaacs "had the plant manager down his throat, engineering down his throat" and he "needed an answer" from Amiott); Casper Dep. 68–69, ECF No. 39-2 (Isaacs "gets so passionate he gets angry" and "lets his anger talk first").)  Amiott testified that she and Isaacs's respective "responsibilities butted heads" and when a problem arose, Isaacs would "come in and start screaming" at her, rather than "meeting one-on-one . . . in a contained office where [their] professional business stayed [their] professional business." (Amiott Dep. 436, ECF No. 39-1.)  Amiott described the incident that spurred the meeting with Casper and Wolski as "aggressive and unprofessional and demeaning"—but not sexist or ageist.  (Amiott Dep. 447, ECF No. 39-1.)  She told Casper that she wanted to "be safe from that kind of bullying"—but bullying is not discrimination.  (Amiott Dep. 449, ECF No. 39-1.)  In essence, Amiott's complaint was not that Isaacs was discriminating against her, it was that he was not conducting himself in a manner appropriate for the workplace.  (Amiott Dep. 26–27, ECF No. 39-1 (testifying that Isaacs would "just start yelling at [her]," which could "have been professionally handled by him" asking her if she was aware of the situation and taking it "to another room" to talk about it, rather than yelling at her "in front of the lab team members"); *id.* at 26 (noting Isaacs "had a habit of behaving"

21

"disrespectful[ly]" and that "it was not professional behavior on his part").)  It may be inappropriate to yell in the workplace, but if the yelling lacks a connection to the receiving end's sex or age, Title VII and the ADEA do not prohibit it.

That connection is lacking here.  Isaacs yelled at everyone, not just older or female employees.  And he testified that Amiott "didn't cower in the corner" but would "come back at [him]" and "gave it to [him] just as much as [he] gave it to her" during their "heated arguments or discussions."  (Isaacs Dep. 66, ECF No. 39-4.)  Another employee testified that Isaacs had "a tendency" "to raise his voice at people."  (Hann Dep. 41, ECF No. 39-3.)  Isaacs engaged in behavior similar to that complained of by Amiott with a male employee.  Isaacs "call[ed] . . . out" the male employee "in front of the whole group," which upset the employee so much he quit.  (Isaacs Dep. 54–55, ECF No. 39-4.)  On a different occasion, Isaacs asked if he and a male coworker "needed to go fight" to hash out a dispute.  (Isaacs Dep. 63–64, ECF No. 39-4.)  This conduct suggests Isaacs may have been a poor colleague, but there is no evidence to show that he was a discriminatory one.

*Skiba v. Illinois Central Railroad Company*, 884 F.3d 708 (785th Cir. 2018), is instructive.  There, the court concluded that the plaintiff "did not engage in any statutorily-protected activity" when he complained that his supervisor was "abusive," frequently "berat[ed], badger[ed], and disrespect[ed]" his subordinates, and that the two had a "personality conflict."  *Id.* at 714–15, 718.  These complaints did not suggest that the plaintiff was "protesting discrimination on the basis of age" or another protected ground, so the plaintiff's retaliation claim failed.  *Id.* at 718–19.

22

The *Skiba* court drew parallels to *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134 (7th Cir. 1997).   There, the plaintiff complained that her manager was "unprofessional" and "a jerk" and had an "abrasive management style" that included "yelling, slamming down the phone, making nasty comments about clients, [and] talking down to his fellow workers." *Id.* at 1136.   While the plaintiff felt that the manager's behavior encompassed sexual discrimination, the court concluded those feelings were "irrelevant" because she did not make them known to her employer. Since the plaintiff did not raise "*specific* concerns or allegations of sexual harassment,"—as opposed to simply the manager's "generally obnoxious and difficult personality"—her retaliation claim failed. *Id.* at 1136.

The same is true here.   Amiott points to no evidence that she "describe[d Isaacs's] conduct as being of a sexually harassing nature." *Gleason*, 118 F.3d at 1136.   In her brief, Amiott goes to great lengths to paint Isaacs as discriminatory.   She repeatedly states that Isaacs yelled at "female employees"—but that characterization is belied by the evidence, as discussed above.   Amiott also details how Isaacs dated or had a sexual relationship with at least one, and possibly two, female employees.   (Pl.'s Resp. 13–15, ECF No. 47.)   But that does not transform the behavior that Casper knew Amiott complained about—that Isaacs yelled at Amiott—into discrimination proscribed by Title VII or the ADEA.

## 2.   Complaining Directly to Casper

Amiott notes that prior to meeting with Wolski, she complained of Isaacs's conduct directly to Casper and told Casper that if Casper could not fix the problem, she would

"escalate it to the next level," that is, to human resources. (Amiott Dep. 460, ECF No. 39-1.) Amiott argues that complaining directly to Casper was protected activity, irrespective of whether Casper knew about the meeting with Wolski. But this argument fails for the same reason—complaining about Isaacs yelling at her was not complaining about conduct proscribed by Title VII or the ADEA.

Finally, Amiott argues that, when considered in the context of her past complaints, her complaint to Casper about Isaacs could be understood to have been complaining about conduct proscribed by Title VII or the ADEA. But any past complaints to Casper about Isaacs's conduct run into the same problem, and past complaints about actions of other coworkers are too attenuated from her complaint here about Isaacs for Casper to have understood that Amiott was raising concerns about what she believed were violations of Title VII or the ADEA. *Cf. Lerman v. Turner*, No. 10-CV-2169, 2013 WL 4495245, at *14 (N.D. Ill. Aug. 21, 2013) (plaintiff presented evidence that an employee who may have affected the adverse action against plaintiff made disparaging remarks about plaintiff's national origin, had an anti-Israeli attitude (plaintiff was Israeli), and was demeaning toward plaintiff on that basis). That is not what happened here.

## C. Harassment

NSK devotes approximately three pages of its opening brief to addressing what it thought was Amiott's sexual harassment claim. (Def.'s Br. 24–27, ECF No. 42.) However, Amiott responds that she "has not alleged" any harassment claims; rather, she "presented evidence of a discriminatory atmosphere" and "harassing and

discriminatory behavior . . . as support for her claims of sex and age discrimination." (Pl.'s Resp. 23 n.7, ECF No. 47.)  NSK asks the Court to enter summary judgment in its favor "on any harassment-based claims" "in order to eliminate any confusion." (Def.'s Reply 3 n.1, ECF No. 52.)  However, NSK does not cite, and the Court is not aware of, any authority that would allow the Court to rule on claims not presently before it.  Presumably, though, such a claim would be barred by issue preclusion if Amiott attempted to bring it in the future.

## Conclusion

NSK's Motion for Leave to File a Sur-reply Brief, (ECF No. 68), is **denied**.  NSK's Motion for Summary Judgment, (ECF No. 38), is **granted**.  Amiott's claims are **dismissed with prejudice**.  Final judgment shall issue separately.

**SO ORDERED**.

Date: 08/22/2022

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution to registered counsel of record via CM/ECF.